IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

STEPHEN C. WALKER,                                        PLAINTIFF

versus                                CIVIL ACTION NO. 5:06cv154-DCB-MTP

CONSTANCE REESE, ET AL.                                   DEFENDANTS

REPORT AND RECOMMENDATION

THIS MATTER is before the court on a Motion to Dismiss or, in the Alternative, for

Summary Judgment [93] filed by defendants ("Motion for Summary Judgment" or "MSJ") and a

Motion for Partial Summary Judgment [106] filed by plaintiff.  Having reviewed the submissions

of the parties and the applicable law, the undersigned recommends that plaintiff's Motion for

Partial Summary Judgment be denied, that defendants' Motion for Summary Judgment be

granted, that plaintiff's claims against defendant Holt be dismissed without prejudice for lack of

personal jurisdiction, and that plaintiff's claims against the remaining defendants be dismissed

with prejudice.

FACTUAL BACKGROUND

This lawsuit arises out of an incident on January 8, 2006, when pro se plaintiff Stephen C.

Walker received chemical burns while working in the Food Service Department ("FSD") at the

Federal Correctional Complex in Yazoo City, Mississippi ("FCC Yazoo City").  Plaintiff arrived

at FCC Yazoo City on October 1, 2005.[1]  After his arrival, plaintiff was assigned to several

different jobs, including in the FSD.  *See* MSJ Exh. 8.  On January 6, 2006, plaintiff received

orientation and safety training, which included information about basic job safety as well as

---

[1] Plaintiff was sentenced on January 26, 2004 by the United States District Court for the
Southern District of Texas to 24 months imprisonment for violation of his supervised release,
consecutive to a 12-month sentence on a charge of false impersonation of an officer or employee
of the United States.  *See* MSJ Exhs. 1-4.

hazardous materials - specifically, how to read Materials Safety Data Sheets ("MSDS"),[2] their

location, proper handling and storage procedures and hazardous materials identification.  Plaintiff

signed a form stating:  "I...have received my Initial Job Orientation and Safety Training required

for my job."  *See* MSJ Exh. 9.  However, plaintiff avers that he never received any training or

safety talk concerning his job assignment, chemicals or MSDS locations.  *See* Declaration of

Stephen C. Walker [101-2] at 2-3.

   At approximately 12:30 p.m. on January 8, 2006,[3] plaintiff was issued Suma Grill D9, an

oven and grill cleaner, along with safety equipment, including gloves,[4] in order to clean a range

hood in the staff dining hall.  One hour later, plaintiff reported that the chemical had seeped

through his gloves and was burning his arms.  Based on the information in the MSDS,[5] plaintiff's

supervisor, Robert Gamble, instructed plaintiff to rinse his arms with cold water and soap until

medical staff could respond.  Plaintiff stated that he had rinsed his arms with water, but that it

made them burn more, so he stopped.  *See* MSJ Exhs. 10-11A, 38, 39.

   Plaintiff alleges that Mr. Gamble attempted to contact the medical department by radio

and telephone.  After twenty minutes had gone by, plaintiff alleges that he showed his burns to

---

[2] An MSDS contains various information about a chemical, including what to do if it comes into contact with a person's skin.

[3] According to the Injury Report signed by plaintiff, the injury occurred at 1:15 p.m.  *See* MSJ Exh. 11a.

[4] Mr. Gamble avers that after the incident in question, he asked plaintiff what gloves he had been using and he said the "yellow gloves."  Mr. Gamble advised plaintiff that he should have been using the thicker black gloves. *See* MSJ Exh. 38.  Plaintiff states that he was only given yellow dishwashing gloves.  *See* Declaration of Stephen C. Walker [101-2].

[5] The MSDS instructs that in the event of skin exposure, the person should "flush thoroughly with plenty of water, wash with mild soap and water, remove contaminated clothes and shoes and clean before reuse. Get medical attention for any painful, red or injured skin."  *See* MSJ Exh. 10.

defendant Craig Coil, former Food Service Administrator ("FSA") at FCC Yazoo City.[6]  At this point, plaintiff claims that the burns had begun to peel and turn black.  Plaintiff claims that he advised Coil that Gamble had been unable to reach the medical department.  According to plaintiff, defendant Coil did nothing.  Plaintiff claims that he returned to Coil several times over the course of the next two hours and forty-five minutes (during which time Gamble was attempting unsuccessfully to reach the medical department), but that he still did nothing.  Plaintiff claims that Coil knew that he had a serious medical condition, but failed to do anything, leaving him in severe pain.  *See* First Amended Cplt. [47-2] ¶¶ 11-15.  Defendant Coil denies that plaintiff returned to him several times that day to show him his injuries, complained of severe pain or asked for medical attention.  Coil avers that if he had believed that plaintiff needed emergency medical treatment and medical staff were unavailable, he could have notified the Operations Lieutenant, who would have decided whether to immediately transport plaintiff for outside medical care.[7]  However, Coil did not believe it was an emergency.  *See* MSJ Exh. 39.  Troy Gurlin, a Cook Supervisor, averred that after the incident in question, he observed plaintiff "smiling and talking with other inmates."  Mr. Gurlin averred that he asked plaintiff if he was okay, and he said he was fine.[8]  Based on this, Mr. Gurlin did not think that plaintiff needed

---

[6] Coil is now FSA at the Federal Penitentiary in Terre Haute, Indiana.  *See* MSJ Exh. 39.

[7] As will be discussed *infra*, FCC Yazoo City had in place various procedures for medical emergencies.  During the hours of medical coverage, Operations Lieutenants were instructed to inform medical staff of medical emergencies.  After-hours, for serious conditions which were considered emergencies (such as profuse bleeding or a complaint of chest pain), the inmate would be transported to the local hospital.  For non-emergencies, a nurse or the Operations Lieutenant would contact the Clinical Director or Medical Duty Officer by telephone, and that individual would make a decision about whether to transport the inmate to the hospital.  If a medical staff member was not available, the Operations Lieutenants had the authority to order the inmate to be transferred immediately to the hospital.  *See* MSJ Exhs. 22, 44-47, 50.

[8] Mr. Gurlin avers that he has gotten D9 on himself at various times while working, and has washed it off and been fine.  *See* MSJ Exh. 40.

urgent medical attention.  *See* MSJ Exh. 40.  Mr. Gamble also did not think it was an emergency situation or that plaintiff needed immediate medical attention.  *See* MSJ Exh. 38.

At the time of the incident in question, Nurse I. Milton was tending to an inmate awaiting emergency transport at the Low security institution.[9]  After the transport arrived, at approximately 3:30 p.m., Nurse Milton rushed to the Medium security institution to provide medical care to plaintiff.  Nurse Milton requested the MSDS from the FSD, and plaintiff's arms were washed per its instructions.  Plaintiff was noted to have first, second and third degree burns on both arms, from his wrists to his elbows.  A doctor was contacted, and plaintiff was transported to Kings Daughters Hospital in Yazoo City for further evaluation.  At the hospital, plaintiff was noted to have blisters and second and third degree burns in some areas.  He was given medication (Silvadene creme and Percocet) and directed to follow up with a burn surgeon. When plaintiff returned to FCC Yazoo City, a nurse noted the information from the hospital, including that plaintiff had received Demerol.  He was given additional pain medication (Tylenol).  *See* MSJ Exhs. 12, 13 & 15 at G-HR0125-26, 266, 274-79.

The following day, plaintiff was examined by medical staff.  He was then transported to Central Mississippi Medical Center ("CMMC") in Jackson for further evaluation.  At CMMC, plaintiff was examined and discharged with instructions to redress the wounds daily with Silvadene creme.  The discharge instructions were noted when plaintiff arrived back at FCC Yazoo City.  Plaintiff was also prescribed additional pain medications: oxycodone and acetaminophen.[10]  *See* MSJ Exh. 15 at G-HR0121-24, 29, 270-73.

_____

[9] FCC Yazoo City consists of three separate institutions: Medium security, Low security, and the camp.  *See* MSJ Exh. 44.  Plaintiff was housed at the Medium security facility.

[10] Plaintiff received oxycodone/acetaminophen daily from January 9-12, 2006.  On January 13 and January 17, 2006, plaintiff's pain medication was renewed.  On January 17, 2006, plaintiff was given wound care for his right arm.  A culture showed that he had a staph infection. Minimal drainage was noted.  Plaintiff was given antibiotics (Bactrim) and

Again, on January 31, 2006, plaintiff received wound care for both arms.  The left arm had no drainage.  Defendant Dr. Anthony Chambers, Clinical Director at FCC Yazoo City, was consulted, and he ordered that wound care for the left arm be discontinued as long as no drainage was present, and that daily wound care for plaintiff's right arm be continued.  The right arm had two small pustules, so a sample for a bacterial culture was taken.[11]  On February 14, 2006, plaintiff was given wound care for both arms.  The open areas on his left arm had widened a bit and there was some drainage (minimal in his right arm, and an unstated amount in his left arm).  Dr. Chambers verbally ordered that plaintiff leave his left arm open to the air.[12]  *See* MSJ Exh. 15 at G-HR097-107 & Exh. 16.

On February 16, 2006, plaintiff reported to medical services at 6 p.m. to have his bandages changed, but Nurse Tommy Clarkson told him that there was no antibiotic ointment available at that institution, and she was the only medical staff member working at the three institutions.  Nurse Clarkson called Dr. Chambers to notify him about this, and Dr. Chambers

---

oxycodone/acetaminophen. On January 21, 2006, plaintiff was given pain medication and wound care for both arms.  His left arm had no drainage and his right arm had a minimal amount.  Both burn areas were red. Two days later, on January 23, 2006, plaintiff again was given wound care for both arms, as well as pain medication.  His left arm had no drainage and his right arm had a slight amount.  Both burn areas were red.  This process was repeated the next day, January 24, 2006, and plaintiff's pain medication was renewed on January 25, 2006.  On January 27, 2006, plaintiff was given wound care for both arms.  He told a doctor he preferred taking Motrin to Percocet (a brand name for oxycodone/acetaminophen), and he was provided with ibuprofen.  His left arm had no drainage and his right arm had a minimal amount.  Both burn areas were noted to have redness. Plaintiff was given wound care for both arms on January 29 and 30, 2006.  On both days his left arm had no drainage and his right arm had an unstated amount.  Red areas were noted on both arms.  *See* MSJ Exh. 15 at G-HR0105-19, 184-86 & Exh. 16.

[11] On February 1 and 6, 2006, plaintiff was given wound care for his right arm, and there was no drainage noted.  From February 11-13, 2006, plaintiff was given daily wound care for both arms.  If drainage was reported, it was minimal.  Some redness was noted.  *See* MSJ Exh. 15 at G-HR097-103.

[12] On February 15, 2006, plaintiff was given wound care for both arms.  His left arm had an unstated amount of drainage and his right arm had minimal drainage.  Redness was noted.  *See* MSJ Exh. 15 at G-HR098.

told her that plaintiff would have to get his bandages changed the following day.  *See* First

Amended Cplt. ¶ 17; MSJ Exh. 15 at G-HR095.  Plaintiff contends that Dr. Chambers knew that

not changing the bandages would put plaintiff at risk, but that he chose to ignore that risk.

Plaintiff claims that as a result, he had to wear the same bandage for another 24 hours, even

though he had a staph infection in his burns.  Plaintiff claims that this lack of medical care

resulted from inadequate medical staffing at the three institutions, which had become the policy,

custom and practice.[13]  *See* First Amended Cplt. ¶¶ 17-21, 40-46.

     Plaintiff claims that on February 21, 2006, he reported to medical services for a bandage

change as ordered by his treating physician at CMMC, but that when he arrived, Dr. Chambers,

who was filling in for a nurse, informed plaintiff that he would have to return the following day,

since he was the only medical staff member at the entire federal complex, and there was a bus of

incoming inmates waiting for him to check them in to the institution.  Plaintiff claims that his

bandages had begun to bleed through at this point, and that he was also fighting a staph infection

in his burns.  Plaintiff alleges that defendant Chambers knew of plaintiff's burns and his infection

but failed to respond, and that as a result, plaintiff's burns turned greenish-yellow in color and he

suffered pain.[14]  *See* First Amended Cplt. ¶¶ 22-26, 47-53.  Plaintiff's health record does not

contain an entry for this date, and Dr. Chambers has no memory of it.  Dr. Chambers avers that

because routine wound care with a dressing change is a minor procedure, "absent some kind of

non-typical circumstances," he would not have told plaintiff that he could not do it.  However,

Dr. Chambers concedes that it is possible that he spoke to plaintiff, made a visual assessment of

---

[13]  On the following day, February 17, 2006, plaintiff was given wound care for both arms.  His left arm had slight drainage and his right arm had a moderate amount.  Again, on February 19 and 20, 2006, plaintiff was given wound care for both arms, and only minimal amounts of drainage were reported.  Redness on both arms was noted.  It was noted on the 20th that plaintiff was still on Bactrim.  *See* MSJ Exh. 15 at G-HR093-98.

[14]  This claim against Dr. Chambers is the subject of plaintiff's Motion for Partial Summary Judgment.

6

his condition, and determined that other matters urgently required his attention at the time.  He states that if he had concluded that plaintiff needed wound care right away, he would have provided it.  *See* MSJ Exh. 45.

The following day, on February 22, 2006, plaintiff was given wound care for his right arm.  His wound was yellow-green and raised, and the bandage was saturated with "purulent drainage."  Dr. Chambers indicated that plaintiff should be transported to an outside medical facility for reevaluation of his burns.[15]  Plaintiff was supposed to be taken to the hospital on February 24 for this reevaluation but there were not enough custody staff on duty that day to escort him.  *See* MSJ Exh. 17; First Amended Cplt. ¶¶ 81-83.  On February 28, 2006, plaintiff was taken to the hospital for assessment of his burns.  He was given wound care and advised to continue with daily dressing changes, but to use Bacitracin rather than Neomycin.  *See* MSJ Exh. 15 at G-HR088-89, 234.  According to plaintiff, the treating nurse at the hospital told him that his wounds were healing slowly because he had a staph infection, and that it was important that his wounds stay clean and the dressings be changed daily.[16]  *See* First Amended Cplt. ¶ 84.

On March 4, 2006, plaintiff received wound care at 3 p.m.  It was noted that there was drainage seeping through his bandage and it had adhered to his wound.  *See* MSJ Exh. 15 at G-HR086-87.  Later that evening, plaintiff approached staff and said he was in pain and was bleeding through the bandages covering his burns.  *See* Declaration of Jerry W. Cramer (MSJ Exh. 49).  Plaintiff claims that he notified the Associate Warden Michael Kruswicki and the shift

---

[15] On February 23, plaintiff was given wound care for his right arm.  There was a scant amount of drainage, and the wound was red, raised and moist.  Plaintiff received wound care for his right arm on February 24, 2006.  A moderate amount of drainage was noted.  The next day, plaintiff received wound care and there was no active drainage.  He was also given wound care on February 26 and 27, 2006, with a scant amount of drainage on the 26th and an unstated amount on the 27th.  *See* MSJ Exh. 15 at G-HR091-94.

[16] Plaintiff received wound care on March 1, 2006, when unspecified drainage was noted.  Wound care was also performed on March 2, 2006, and scant drainage was noted.  *See* MSJ Exh. 15 at G-HR086.

lieutenant but was informed that there were no medical personnel on-site.  According to plaintiff, Mr. Kruswicki attempted to contact the medical department by radio but received no response, and instructed plaintiff to see the lieutenant outside, who told him that there was nothing he could do.  Plaintiff claims that he asked the lieutenant if he could get fresh bandages, but was told that he could not, and that he would have to wait until the morning to see medical staff.  *See* First Amended Cplt. ¶¶ 16, 54-58; Declaration of Stephen C. Walker [101-2] at 5-6.

According to defendants, medical staff were unavailable because it was a weekend and was after 7 p.m.  Lieutenant Cramer states that he looked at plaintiff's bandages but plaintiff was not, in fact, bleeding through them, so he told plaintiff that he would have to wait until the morning when medical staff would be available.  Lieutenant Cramer avers that if he thought plaintiff had needed urgent medical attention, he could have contacted the on-call Medical Duty Officer for instructions or sent plaintiff to the local hospital; however, based on what he had seen, he did not consider plaintiff to need urgent medical attention.  *See* MSJ Exh. 49.  Plaintiff claims that for the rest of that night he was in pain and continued to bleed through his bandage.[17] *See* First Amended Cplt. ¶¶ 16, 54-58.

On March 14, 2006, plaintiff was given wound care for his right and left arms.  There was a slight amount of drainage from his right arm and no drainage from his left arm.  *See* MSJ Exh. 15 at G-HR074-75.  At 11:20 that night, plaintiff contacted his unit officer, David Wilson, and informed him that his bandages were leaking.  *Se*e MSJ Exh. 18.  Officer Wilson noted that there

_____

[17] Plaintiff received wound care the following day, March 5, 2006, at 2 p.m.  Drainage was observed and a culture was taken.  Plaintiff received wound care for his right arm on March 6, 2006, with slight drainage noted, and again on March 7 and 8, with moderate drainage and redness noted.  On March 9, 10 and 11, he received wound care for his right arm, and scant drainage and redness, with no swelling, were noted.  On March 12, 2006, plaintiff was given wound care for both arms.  On his right arm, scant drainage was noted; on his left arm, no drainage was noted.  On March 13, 2006, plaintiff was given wound care for his right and left arms.  There was a slight amount of drainage from his right arm and no drainage from his left arm.  A new blister was noted on his left arm.  Dr. Chambers was consulted and prescribed an antibiotic. *See* MSJ Exh. 15 at G-HR076-84.

was some blood coming through the bandages, but it was not a large amount and the bandages were not soaked.  *See* Declaration of David E. Wilson (MSJ Exh. 41).  According to plaintiff, however, his bandages were soaked through with blood and fluid.  *See* First Amended Cplt. ¶¶ 27, 59.  Officer Wilson contacted the Operations Lieutenant, defendant Bobby G. Raines, and told him that plaintiff was reporting that blood was seeping through his bandages, but, in fact, it was not.  Officer Wilson did not consider plaintiff's condition to be a medical emergency.  Lieutenant Raines advised Officer Wilson that there were no medical personnel at the facility and that plaintiff should have his bandages changed in the morning.  Lieutenant Raines avers that he spoke with plaintiff on the telephone and plaintiff said he would be all right until the following morning.  Therefore, he did not believe that plaintiff was having a medical emergency.  If he had, he could have contacted the on-call Medical Duty Officer for instructions, or ordered plaintiff to be immediately transported for medical care at the local hospital.  *See* MSJ Exhs. 41 & 42.  Plaintiff alleges that he was "left to continue bleeding throughout the night," and was in pain and unable to sleep.  *See* First Amended Cplt. ¶¶ 27, 59.  Plaintiff was given wound care for his right and left arms the following day.  There was no drainage from his right arm.  It was not noted if there was drainage from his left arm.  Plaintiff complained to the nurse that his dressing had become saturated and he had to remove it himself because it was cutting into his arm.  *See* MSJ Exh. 15 at G-HR075.

Plaintiff continued to receive daily wound care through May 20, 2006[18] and on June 12, 2006, his burns were evaluated and he was found to have no current symptoms or concerns.  The following day, Dr. Roberto Martinez, Medical Officer at FCC Yazoo City, certified that plaintiff's arms had healed.  *See* MSJ Exh. 15 at G-HR002.  Plaintiff was released from the

---

[18] The record does not contain entries for April 7 and 22, or May 2 and 10, 2006.

custody of the Bureau of Prisons ("BOP") custody on June 14, 2006.[19]

Plaintiff filed suit on November 17, 2006 against the United States and the following individuals:  Dr. Chambers; Lieutenant Raines; Craig Coil;[20] Constance Reese, Warden at FCC Yazoo City; Scott Fisher, formerly Associate Warden at FCC Yazoo City;[21] Mary Thomas, Assistant Health Systems Administrator at FCC Yazoo City; and R.E. Holt, Regional Director for the BOP's Southeast Region.  In his First Amended Complaint, plaintiff makes a number of *Bivens*[22] claims against the individual defendants in their individual capacities,[23] for denial and/or delay in medical treatment based upon the alleged incidents of January 8, February 16, February 21, February 24, March 4 and March 14, 2006.  Plaintiff also makes claims against defendants Reese, Chambers, Fisher and Thomas regarding policy, custom and practice - specifically, that from October 2005 until June 14, 2006, there was a policy and practice of not having medical personnel on-site and of under-staffing the medical department, and that he was deprived of adequate medical attention on multiple occasions as a result.  Plaintiff also asserts an FTCA

---

[19] Plaintiff was released into the custody of the Harris County Sheriff's Office, to be tried on a Texas state charge of sexual assault of a child.  Plaintiff was subsequently convicted of the charge and is currently serving time in the Texas correctional system.  The Texas Department of Criminal Justice website reflects that plaintiff received a 12-year sentence and his projected release date is May 12, 2016.  *See* MSJ Exhs. 4A-6.

[20] Plaintiff originally named Coil as a defendant under the FTCA, but because an FTCA claim can only be filed against the United States, the court dismissed Coil, as well as the BOP, in an Order [12] entered on January 26, 2007.  Coil is now named in his individual capacity.

[21] Mr. Fisher is now Warden at the Federal Prison Camp in Pensacola, Florida.

[22] *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  A *Bivens* action mirrors a civil rights action brought under 42 U.S.C. § 1983, the difference being that a *Bivens* action applies to alleged constitutional violations by federal actors, while a section 1983 action applies to alleged constitutional violations by state actors.  *See Izen v. Catalina*, 398 F.3d 363, 367 n.3 (5th Cir. 2005).

[23] "[A] *Bivens* action may be maintained against a defendant only in his or her individual capacity, and not in his or her official capacity."  *Pollack v. Meese*, 737 F. Supp. 663, 666 (D.D.C. 1990); *see also Gibson v. Fed'l Bureau of Prisons*, 121 Fed. Appx. 549, 551 (5th Cir. Dec. 30, 2004).

claim based on the March 14, 2006 incident.  Finally, plaintiff makes a claim under the

Administrative Procedure Act ("APA") seeking judicial review of the actions of defendant Reese

and the BOP.  Defendants have moved for summary judgment on all of plaintiff's claims, and

plaintiff has moved for partial summary judgment on his *Bivens* claim against Dr. Chambers

relating to the events of February 21, 2006.

STANDARD FOR SUMMARY JUDGMENT

Because the defendants have submitted matters outside the pleadings with their Motion to

Dismiss or, in the Alternative, for Summary Judgment [93], the motion should be characterized

as a motion for summary judgment.  *See* Fed. R. Civ. P. 12(b); *Young v. Biggers*, 938 F.2d 565,

568 (5th Cir. 1991).  Summary judgment shall be granted "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter

of law." Fed. R. Civ. P. 56(c).  Summary judgment is proper  "where a party fails to establish the

existence of an element essential to his case and on which he bears the burden of proof."

*Washington v. Armstrong World Indus.*, 839 F.2d 1121, 1122 (5th Cir. 1988).  "A complete

failure of proof on an essential element renders all other facts immaterial because there

is no longer a genuine issue of material fact."  *Id.*

This court may grant summary judgment only if, viewing the facts in a light most

favorable to the plaintiff, the defendant demonstrates that there is no genuine issue of material

fact and that he is entitled to judgment as a matter of law.  *Woods v. Smith,* 60 F.3d 1161, 1164

(5th Cir. 1995).  If the defendant fails to discharge the burden of showing the absence of a

genuine issue concerning any material fact, summary judgment must be denied.  *John v. State of*

*Louisiana,* 757 F.2d 698, 708 (5th Cir. 1985).  The existence of an issue of material fact is a

question of law that this court must decide, and in making that decision, it must  "draw

inferences most favorable to the party opposing the motion, and take care that no party will be

11

improperly deprived of a trial of disputed factual issues." *Id.* at 712 (quoting *U.S. Steel Corp. v. Darby*, 516 F.2d 961, 963 (5th Cir. 1975)).

There must, however, be adequate proof in the record showing a real controversy regarding material facts. "Conclusory allegations," *Lujan v. National Wildlife Federation*, 497 U.S. 871, 902 (1990), unsubstantiated assertions, *Hopper v. Frank*, 16 F.3d 92, 96-97 (5th Cir. 1994), or the presence of a "scintilla of evidence," *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994), is not enough to create a real controversy regarding material facts. In the absence of proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

ANALYSIS

Lack of Personal Jurisdiction Over Holt

Defendants argue that plaintiff has failed to establish that defendant Holt has sufficient "minimum contacts" with Mississippi and, therefore, he should be dismissed for lack of personal jurisdiction. Holt is employed at the BOP's Southeast Regional Office in Atlanta, Georgia as Regional Director for the Southeast Region.[24] *See* MSJ Exh. 50; First Amended Cplt. ¶ 6.

In order for this court to exercise personal jurisdiction over Holt, a non-resident, plaintiff must show that he purposely directed activities towards Mississippi or purposely availed himself of the privileges of conducting activities here, and that the cause of action arises out of or results from Holt's forum-related contacts. *Nuovo Pignone, v. Storman Asia M/V*, 310 F.3d 374, 378 (5th Cir. 2002) (*citing Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). Plaintiff alleges that he wrote a letter to Holt and "filed grievances to his office," and "the response to this letter [was] signed by defendant Holt." Plaintiff alleges that Holt "knew or should have known of the risk to the plaintiffs [*sic*] safety," and did not respond reasonably to the situation, and that

---

[24] The Southeast Region is comprised of Mississippi, Alabama, Georgia, Florida and South Carolina. *See* http://www.bop.gov/locations/maps/SER.jsp (last accessed Aug. 6, 2008).

he "intentionally disregarded policy" and denied him "minimal levels of safety and timely and adequate medical care and safety."  Plaintiff further alleges that Holt had a conversation with Warden Reese concerning staffing issues, and that Holt came to FCC Yazoo City and conducted a Program Review.  Plaintiff claims that Holt failed to properly supervise Warden Reese.  *See* First Amended Cplt. ¶¶ 67-68, 87-91; Plaintiff's Response to MSJ [101] at 59.

Courts have held that mere allegations relating to a BOP official's decisions regarding an inmate's administrative appeal outside the forum state, and other supervisory activities over a facility inside the forum state, are insufficient to establish personal jurisdiction.  *See Murrell v. Chandler*, 2007 WL 869568, at * 4 (E.D. Tex. Mar. 21, 2007) (granting defendants' motion to dismiss BOP's Administrator of National Inmate Appeals, located in Washington, D.C., for lack of personal jurisdiction, stating that "plaintiff's allegations that [defendant] decided his administrative appeals outside the state of Texas is not sufficient contact to support a finding of personal jurisdiction"); *Jones v. Hawk-Sawyer*, 2000 WL 34203850, at * 2 (N.D. Tex. Oct. 19, 2000) (dismissing claim against director of BOP, located in Washington, D.C., because "[p]laintiff's allegations that [defendant] decided two administrative appeals outside the state of Texas and his conclusory allegations of conspiracy are not sufficient contact to support a finding of personal jurisdiction"); *see also Hill v. Pugh*, 75 Fed. Appx. 715, 719 (10th Cir. Sept. 11, 2003) (dismissing claims against BOP Regional Director, located in Kansas, and BOP Director, located in Washington, D.C., for lack of personal jurisdiction, holding that it was "not reasonable to suggest that federal prison officials may be hauled into court simply because they have regional and national supervisory responsibilities over facilities within a forum state [Colorado]"); *Johnson v. Rardin*, 1992 WL 9019, at * 1 (10th Cir. Jan. 17, 1992) (dismissing BOP Director and Regional Counsel for lack of minimum contacts where their only involvement was reviewing inmate's appeals and occasionally advising prison staff members in forum state); *Durham v. Lappin*, 2006 WL 2724091, at * 5 (D. Colo. Sept. 21, 2006) (dismissing claim against

BOP Director, National Inmate Appeals Administrator and BOP Regional Director, holding that their contacts with the forum state "were completely fortuitous, resulting from the fact that the Plaintiff-to whom they were responding when answering grievances-was located in Colorado"); *Thornton v. Quinlan*, 864 F.Supp. 90, 92 (S.D. Ill. 1994) (declining to exercise jurisdiction over director of BOP whose only contacts with Illinois were in his official capacity).

The court finds persuasive the reasoning set forth in the case law cited above. The fact that defendant Holt, in his official capacity, responded to plaintiff's letter and that he supervises FCC Yazoo City and Warden Reese as part of his responsibilities as Regional Director, are insufficient to establish personal jurisdiction. Accordingly, defendant Holt should be dismissed from this action without prejudice for lack of personal jurisdiction.

<u>Statutory Immunity for Defendant Chambers</u>

Defendants argue that Dr. Chambers is statutorily immune from suit pursuant to 42 U.S.C. § 233(a), which provides in part as follows:

> The remedy against the United States ... for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigation, by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee (or his estate) whose act or omission gave rise to the claim.

The Fifth Circuit has held that Section 233(a) "provides immunity from suit for a PHS employee who causes personal injury to a patient 'resulting from the performance of medical, surgical ... or related functions,' provided that the employee was acting within the scope of his employment at the time of the incident causing such injury." *Schrader v. Sandoval*, 1999 WL 1235234, at * 2 (5th Cir. Nov. 23, 1999). As a result, "if the employee's actions occurred within the course of his duties, a plaintiff's sole remedy is to proceed against the United States under the Federal Tort

Claims Act." *Id.*; *see also Montoya-Ortiz v. Brown*, 154 Fed. Appx. 437, 439 (5th Cir. Nov. 22, 2005) (affirming dismissal of *Bivens* claims, stating that Section 233(a) "preempts *Bivens* claims, providing that a plaintiff's sole remedy under that section is a claim brought under the FTCA."). Likewise, other jurisdictions have dismissed *Bivens* claims brought against PHS employees based on statutory immunity. *See Anderson v. Bureau of Prisons*, 176 Fed. Appx. 242, 243 (3d Cir. Apr. 11, 2006), *cert. denied*, 547 U.S. 1212 (2006); *Cuoco v. Moritsugu*, 222 F.3d 99, 107-08 (2d Cir. 2000); *Walls v. Holland*, 1999 WL 993765, at * 2 (6th Cir. Oct. 18, 1999); *Lewis v. Sauvey*, 708 F.Supp. 167, 169 (E.D. Mich. 1989).

At the time of the events in question, Dr. Chambers was employed by the BOP as the Clinical Director at FCC Yazoo City and was a commissioned officer in the U.S. Public Health Service ("PHS") with the rank of Commander.  In this capacity, Dr. Chambers provided inmates with medical assessments, treatment and care, as well as handled various administrative matters for the Health Services Department.  *See* MSJ Exh. 45.  According to plaintiff, on February 16, 2006, he reported to medical services for a bandage change, and Nurse Clarkson informed him that they were lacking the necessary supplies.  According to plaintiff, Nurse Clarkson called Dr. Chambers who said that he would have to wait until the following day to have his bandages changed.  Plaintiff also alleges that on February 21, 2006, he sought medical treatment from Dr. Chambers, but was informed by Dr. Chambers that he would have to return the following day, since he was the only medical staff member at the entire federal complex, and there was a bus of incoming inmates waiting for him to check them in to the institution.  Plaintiff alleges that Dr. Chambers was deliberately indifferent to his medical needs and as a result, he suffered pain and his burns became infected.  *See* First Amended Cplt. ¶¶ 17-26, 40-53; Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment [107] at 1-2.

Plaintiff argues that the behavior of which he complains occurred outside the scope of Dr. Chambers' employment.  Plaintiff reasons that Dr. Chambers did not provide medical treatment;

rather, he *denied* medical treatment.  *See* Response to MSJ at 57.  This argument is

unconvincing.  Assuming *arguendo* that the events in question took place as alleged,[25] it is clear

that Dr. Chambers' decision to deny medical treatment and defer it to the next day occurred

within the scope of his employment as a medical doctor and as Clinical Director at FCC Yazoo

City.  The fact that medical treatment was allegedly denied, rather than provided, makes no

difference in this analysis.  *See*, *e.g.*, *Cuoco*, 222 F.3d at 109 (finding immunity for BOP doctor

based on allegation that he refused to authorize a particular medical treatment).  Accordingly, Dr.

Chambers should be granted summary judgment on plaintiff's claims.[26]

Claims Against the United States are Barred

Federal Tort Claims Act

Plaintiff asserts a claim against the United States under the Federal Tort Claims Act

("FTCA"), 28 U.S.C. § 1346(b), 2671, *et seq.*, based on the alleged denial of medical care on

March 14, 2006 and the alleged violations of BOP policy.  *See* First Amended Complaint ¶¶ 75-

80; Response to MSJ at 2.  Defendants argue that because plaintiff's injury was work-related, the

exclusive remedy is provided by the BOP's Inmate Accident Compensation ("IAC") procedures

set forth in 28 C.F.R. § 301.101, *et seq*, which "govern the payment of accident compensation,

necessitated as a result of work-related injuries, to federal prison inmates...."[27]  These

regulations were promulgated pursuant to 18 U.S.C. § 4126(c)(4), which provides that the Prison

Industries Fund may be used to compensate "inmates ... for injuries suffered in any industry or in

---

[25] As noted *supra*, plaintiff's health record does not contain an entry for February 21,
2006, and Dr. Chambers has no memory of it.  *See* MSJ Exhs. 15, 45.

[26] The claim relating to the events of February 21, 2006 is the basis of plaintiff's motion
for partial summary judgment against Dr. Chambers [107].  As the undersigned is recommending
that defendants' Motion for Summary Judgment be granted, plaintiff's Motion for Partial
Summary Judgment should be denied.

[27] Plaintiff was given a copy of these procedures on October 1, 2005.  *See* MSJ Exh. 31.

any work activity in connection with the maintenance or operation of the institution in which the inmates are confined."

In *U.S. v. Demko*, 385 U.S. 149, 153-54 (1966), the Supreme Court held that the prison compensation law embodied in 18 U.S.C. § 4126 is the exclusive remedy for a federal prisoner injured while working, regardless of allegations of governmental negligence. "*Demko* makes clear that § 4126 is the sole remedy against the government where the injury is work-related, and the cause of the injury is irrelevant so long as the injury itself occurred while the prisoner was on the job." *Aston v. U.S.* 625 F.2d 1210, 1211 (5th Cir. 1980) (*per curiam*); *see also U.S. v. Cole*, 376 F.2d 848, 849 (5th Cir. 1968) (*per curiam*). This conclusion is not altered by the fact that plaintiff's claims relate to the alleged negligence of prison staff in providing him or failing to provide him medical care after the work-related injury occurred. Since plaintiff's original injury was work-related, Section 4126 remains his exclusive remedy. *See Thompson v. U.S.*, 495 F.2d 192, 193 (5th Cir. 1974) (*per curiam*) ("Despite the appellant's allegation that the negligence of the hospital worker occasioned further injuries, for which he seeks damages, he is barred from litigating the matter under the Federal Tort Claims Act since the cause of his original injury was work-related and compensable under 18 U.S.C. § 4126.") (citation omitted); *Ramirez v. Euteil*, 45 Fed. Appx. 318 (5th Cir. June 18, 2002) (affirming dismissal of FTCA claim where inmate alleged deficient medical treatment following work-related injury); *see also Cooleen v. Lamanna*, 2007 WL 2687319, at * 5 (3d Cir. Sept. 19, 2007) ("To the extent that [plaintiff] argues that his particular claim is brought in connection with the subsequent negligence of his prison doctors, rather than his initial work related injury, numerous courts have recognized that such a claim is still clearly barred by *Demko*."); *Vander v. U.S. Dep't of Justice*, 268 F.3d 661, 664 (9th Cir. 2001) ("When a prisoner is injured on the job, he cannot bring an action against the United States under the FTCA for that injury or for negligence by United States agents regarding the treatment of that injury."); *Wooten v. U.S.*, 825 F.2d 1039, 1044 (6th Cir. 1987) ("Section 4126 is ... the

exclusive remedy when a work-related injury is subsequently aggravated by negligence and malpractice on the part of prison officials....").

Despite this authority, plaintiff argues that he can bring his claim under the FTCA because "the events giving rise to such claim is [*sic*] outside the scope of Plaintiff's institutional employment, not work related, nor an aggrivation [*sic*] of his injury because or due to medical negligence."  He argues that he is not seeking compensation for the initial injury, nor for its aggravation by him not receiving medical care immediately thereafter; rather, his claim is based upon defendants' negligence on March 14, 2006.  He argues that the government failed to fulfill its duty under 18 U.S.C. § 4042(a)(2) and (3)  to "provide for the safekeeping, care and subsistence of all persons ... convicted of offenses against the United States" and to "provide for the protection ... of all persons ... convicted of [such] offenses," and that Section 4126 did not abrogate those duties.  *See* Response to MSJ at 2, 18-25.  However, the gravamen of plaintiff's claim is that he either failed to receive necessary medical treatment, or that he received negligent medical treatment, for the injury he sustained on January 8, 2006.  As that injury was work-related, such a claim is clearly barred under the FTCA and plaintiff's only remedy against the United States is under Section 4126.[28]  Accordingly, plaintiff's claim against the United States should be dismissed.

Administrative Procedure Act

Plaintiff also asserts a claim against the United States under the APA, 5 U.S.C. § 701-

─────────────

[28] Plaintiff submitted an FTCA claim which was rejected by the BOP on October 18, 2006, on the ground that it was barred by the IAC procedures.  Plaintiff submitted another FTCA claim which was denied as repetitive on January 12, 2007.  Plaintiff also submitted a claim pursuant to the IAC procedures and was paid "lost time" wages.  However, plaintiff was denied any additional damages because the Safety Committee found that plaintiff had no residual impairment from his injury, as indicated on his final medical examination.  Plaintiff submitted another FTCA claim which was denied on September 24, 2007 as inaccurate and repetitive.  Thereafter, plaintiff filed another tort claim which was rejected on October 31, 2007 as repetitive and as barred by the IAC procedures.  *See* MSJ Exhs. 29, 29A, 32-34, 36, 37 & 48.

706.  By this claim, plaintiff seeks "review of agancy [*sic*] action of using one nurse for three

separate [*sic*] institutions during the required hours of medical staff coverage, and a declaratory

judgment."  *See* First Amended Cplt. ¶ 94; Response to MSJ at 2-3.  However, as plaintiff is no

longer housed at FCC Yazoo City and, in fact, has been released from BOP custody altogether,

any claim for injunctive or declaratory relief is moot.  *See Herman v. Holiday*, 238 F.3d 660, 665

(5th Cir. 2001) (claims for injunctive and declaratory relief based on exposure to asbestos were

mooted by transfer to another prison); *Edwards v. Johnson*, 209 F.3d 772, 776 (5th Cir. 2000)

(request for injunctive relief becomes moot when inmate leaves the complained-of facility)

(citations omitted); *Cooper v. Sheriff, Lubbock Cty.*, 929 F.2d 1078, 1084 (5th Cir. 1991) (claims

for injunctive relief based on denial of food at prior jail were moot); *Pitre v. David Wade

Correctional Ctr.*, 2008 WL 466160, at * 3 (W.D. La. Feb. 14, 2008) (dismissing as moot

plaintiff's claims for injunctive relief because he transferred to another prison after filing the

complaint).  Accordingly, plaintiff's claim under the APA should be dismissed.

Claims Against Remaining Individual Defendants - Denial of Medical Treatment

        "Prison officials violate the constitutional proscription against cruel and unusual

punishment when they are deliberately indifferent to a prisoner's serious medical needs, as doing

so constitutes unnecessary and wanton infliction of pain."  *Davidson v. Texas Dep't of Criminal

Justice*, 91 Fed. Appx. 963, 964 (5th Cir. Mar. 19, 2004), *cert. denied*, 543 U.S. 864 (2004)

(*citing Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).  The Fifth Circuit has noted that deliberate

indifference "is an extremely high standard to meet."  *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th

Cir. 2006) (*quoting Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.

2001)).  An official acts with deliberate indifference only when he or she knows of and

disregards an excessive risk to a prisoner's health or safety.  *Harris v. Hegmann*, 198 F.3d 153,

159 (5th Cir. 1999) (citations omitted).  This means that "the official must both be aware of facts

from which the inference could be drawn that a substantial risk of serious harm exists, and he

must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *accord Gobert*, 463 F.3d at 348 ("First, the applicable *mens rea* of deliberate indifference demands subjective knowledge of a substantial health risk.").

To successfully make out a showing of deliberate indifference, plaintiff must "submit evidence that prison officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any other similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Davidson*, 91 Fed. Appx. at 965 (*quoting Domino*, 239 F.3d at 756). "Unsuccessful medical treatment, ordinary acts of negligence, or medical malpractice do not constitute a cause of action under § 1983." *Id.* (*citing Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999)). A prisoner's "disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs." *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 2001). Further, "[d]elay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference [that] *results in substantial harm*." *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (emphasis added) (citation omitted).

There is no *respondeat superior* liability in *Bivens* actions. *Cronn v. Buffington*, 150 F.3d 538, 544 (5th Cir. 1998). Thus, in order to be liable, a prison official must either be personally involved in the acts that caused the constitutional deprivation, or must "implement a policy so deficient that the policy itself acts as a deprivation of constitutional rights." *Id.*

<u>Defendants Reese, Fisher and Thomas</u>

As set forth in their Declarations and elsewhere in the record, defendants Reese, Fisher and Thomas hold supervisory positions and were not personally involved in the alleged denial of medical care.[29] Indeed, plaintiff does not allege that these defendants were personally involved

---

[29] Warden Reese is not medically trained and was not involved in providing plaintiff's medical care. She relied on the medical staff for determinations as to inmates' treatment needs. *See* MSJ Exh. 44. Scott Fisher, as Associate Warden of Operations, provided administrative oversight to the Health Services Department. He is not medically trained and was not directly

in his medical treatment.  Thus, plaintiff's *Bivens* claims against these defendants relating to

alleged denial of medical treatment should be dismissed.  *See Camberos v. Branstad*, 73 F.3d

174, 176 (8th Cir. 1995) (holding that because the warden and medical treatment director "lacked

medical expertise, they cannot be liable for the medical staff's diagnostic decision not to refer

[plaintiff] to a doctor to treat his shoulder injury"); *Cuoco v. Moritsugu*, 222 F.3d 99, 111 (2nd

Cir. 2000) (holding that the failure of the non-doctor defendants – Warden and Health Services

Administrator – to intervene in the medical treatment of an inmate was not objectively

unreasonable, even if it was wrongful).  Because defendants Reese, Fisher and Thomas were not

personally involved in plaintiff's medical treatment, and because there is no *respondeat superior*

liability in a *Bivens* action, plaintiff's claims against these defendants should be dismissed.

<u>Defendants Coil and Raines</u>

With respect to defendant Coil, plaintiff has asserted a claim based on the alleged events

of January 8, 2006 - specifically, plaintiff alleges that despite his knowledge of plaintiff's serious

medical needs, Coil did not attempt to secure the necessary emergency medical attention, thereby

exacerbating his injuries.  *See* First Amended Cplt. ¶¶ 11-15.  However, the record shows that

only two hours elapsed between plaintiff's injury and the time when he was seen by medical

staff.  The reason for the delay was because the nurse on duty was providing emergency medical

treatment to another inmate.  In the meantime, plaintiff was instructed on how to treat his wound,

per the MSDS.  "[D]elay in medical care can only constitute an Eighth Amendment violation if

there has been deliberate indifference, which results in substantial harm."  *Mendoza v. Lynaugh*,

989 F.2d 191, 195 (5th Cir. 1993).  Plaintiff has not shown that defendant Coil was deliberately

---

involved in providing the plaintiff's medical care or in making decisions about that medical care.
He relied on the medical staff for determinations as to inmates' treatment needs.  *See* MSJ Exh.
46.  Mary Thomas, the Health Systems Administrator, was responsible for various administrative
matters.  She did not provide inmates with hands-on medical assessments or treatment, relying
instead on the treating medical staff.  *See* MSJ Exh. 47.

indifferent.  Indeed, Coil averred that he did not believe it was an emergency situation and that if he had thought that plaintiff needed immediate medical treatment, he could have notified the Operations Lieutenant.  *See* MSJ Exh. 39.  There is no indication that anyone else present thought that plaintiff's situation was an emergency or that he needed immediate medical attention.  *See* MSJ Exhs. 38 & 40.  Thus, plaintiff cannot demonstrate that defendant Coil knew of and disregarded an excessive risk to his health or safety.  *See Harris*, 198 F.3d at 159 (citations omitted); *see also Farmer*, 511 U.S. at 837; *Gobert*, 463 F.3d at 348.  Of course, to the extent that defendant Coil's inaction may have been negligent, this does not rise to the level of a constitutional violation.  *Daniels v. Williams*, 474 U.S. 327, 333-34 (1986).

Nor has plaintiff shown that the delay in receiving treatment resulted in substantial harm.  *Easter*, 467 F.3d at 464; *see also O'Bryant v. Culpepper*, 214 F.3d 1350, at * 1 (5th Cir. 2000) ("Although [plaintiff] was injured on a Saturday and did not receive treatment until the following Tuesday, he cannot show that the delay in treating his injury caused substantial harm."); *Hines v. Cain*, 2007 WL 891880, at * 12 (E.D. La. Mar. 20, 2007) (dismissing claim where delay in treatment "did not cause 'a lifelong handicap or permanent loss' sufficient to constitute a serious medical need for constitutional purposes") (citations omitted).

As for defendant Raines, plaintiff asserts a claim relating to the alleged denial of medical treatment on March 14, 2006.  Specifically, plaintiff alleges that defendant Raines was deliberately indifferent by failing to secure medical attention and by failing to adequately assess the situation.  *See* First Amended Cplt. ¶¶ 27-32.  However, the record reflects that Officer Wilson told defendant Raines that although plaintiff was reporting that blood was seeping through his bandages, that was not actually the case.  Lieutenant Raines avers that he spoke with plaintiff on the telephone and he said he would be all right until the following morning and, therefore, he did not consider plaintiff to be having a medical emergency.  Lieutenant Raines avers that if he had thought that plaintiff needed urgent medical attention, he could have

22

contacted the on-call Medical Duty Officer for instructions, or ordered plaintiff to be immediately transported to the local hospital. *See* MSJ Exhs. 41 & 42. Thus, plaintiff cannot establish that defendant Raines knew of and disregarded an excessive risk to his health or safety. *See Harris*, 198 F.3d at 159 (citations omitted); *see also Farmer*, 511 U.S. at 837; *Gobert*, 463 F.3d at 348. Nor has plaintiff shown that the delay in receiving medical treatment resulted in substantial harm.[30] *See Hines*, 2007 WL 891880, at * 12. And again, to the extent that defendant Raines' conduct may have been negligent, this does not establish a constitutional violation. *Daniels*, 474 U.S. at 333-34.

Accordingly, having failed to establish deliberate indifference, plaintiff claims against defendants Coil and Raines should be dismissed.

<u>Policy and Procedure Claim</u>

Plaintiff also claims that defendants Reese, Chambers, Fisher and Thomas pursued unconstitutional policies and practices - specifically, policies of under-staffing the medical department, not having medical staff on-site and not providing basic first aid after-hours. Plaintiff claims that as a result, these defendants were deliberately indifferent to his (and other inmates') serious medical needs. *See* First Amended Cplt. ¶¶ 33-74.

It is true that at the time of plaintiff's injury and during his subsequent care, FCC Yazoo City did not have a medical staff member working at each one of the complex's three separate institutions 24 hours a day. However, as noted *supra*, BOP policy did not require 24-hour staffing and, further, FCC Yazoo City had received an exemption from the requirement of 16-hour staffing. The record reflects that there were procedures in place to deal with medical situations and emergencies - both during those times when there was medical staff coverage and during off-hours. Specifically, an Operations Lieutenant was on duty at each of the three

---

[30] Plaintiff was given wound care the following day. *See* MSJ Exh. 15 at G-HR075.

institutions at all times.  During the hours of medical coverage, Operations Lieutenants were instructed to inform medical staff of medical emergencies.  After-hours, for serious conditions which were considered emergencies (*e.g.*, an inmate bleeding profusely or having chest pain), the inmate would be taken to the local hospital.  For non-emergencies, a nurse or the Operations Lieutenant would contact the Clinical Director (Dr. Chambers) or the Medical Duty Officer by telephone, and that individual would decide whether to transport the inmate to the hospital.  If a medical staff member was not available, the Operations Lieutenants had the authority to order the inmate to be transferred immediately to the hospital.  Operations Lieutenants were"well aware" of this authority, and were instructed that when in doubt, they should  "err on the side of caution" and order an inmate transported to the hospital.  *See* MSJ Exhs. 22, 44-47, 50.

With regard to plaintiff's allegations of under-staffing, defendants concede that the medical staffing at FCC Yazoo City "was not at full compliment."  However, the record reflects that the institution took steps to ensure that inmates' medical needs were appropriately met.  For example, BOP medical staff from other institutions came to FCC Yazoo City on temporary duty assignment to provide medical care for inmates.  At other times, there were contract medical staff from the community, including physicians, hired to assist with providing medical care.  In addition, extensive recruitment efforts to hire additional medical staff were undertaken by the Employee Services Department, including attending numerous job fairs, visiting educational institutions, mass mailings, word-of-mouth recruiting and placing job advertisements in local and national newspapers and on the internet.  Indeed, FCC Yazoo City has spent thousands of dollars in efforts to recruit medical staff.[31]   *See* MSJ Exhs.30, 43-47, 50.

Liability for a policy can only be imposed if the policy can be said to be "so deficient that

---

[31] Kitty B. Suddeth, Employee Services Manager at FCC Yazoo City, explained that the reasons it has been hard to recruit and retain medical staff are the remoteness of the institution's location and salary constraints.  *See* MSJ Exh. 43.

the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" *Thompkins v. Belt*, 828 F.2d 298, 304-05 (5th Cir. 1987).   It is clear that based on the foregoing, there were policies and procedures in place at FCC Yazoo City to ensure that inmates, including plaintiff, received adequate medical care, and that there were extensive efforts made to ensure adequate medical staffing.  Moreover, the record reflects that plaintiff received medical treatment regularly for the chemical burns he received on January 8, 2006.  Notably, the latest medical records before plaintiff's release from BOP custody indicate that there was no evidence of infection and that plaintiff's burns had healed.  *See* MSJ Exh. 15. Plaintiff has failed to establish that defendants pursued any unconstitutional policies or procedures, or that these policies caused him harm.  Nor can he establish deliberate indifference on defendants' part.  Indeed, defendants have averred that the procedures put in place at FCC Yazoo City with respect to medical care and emergencies, and the steps taken to recruit additional medical staff, were sufficient to provide medical care to the inmates at FCC Yazoo City, including plaintiff.  At no time did any of the defendants conclude that the level of medical staffing was inadequate to provide inmates with needed care.  *See* MSJ Exhs. 43-47, 50. Accordingly, plaintiff's policy and procedure claims against defendants Reese, Chambers, Fisher and Thomas should be dismissed.

Policy Violations

Plaintiff claims that defendants violated BOP Program Statements 6010.02,[32] 6013.01[33]

---

[32] PS 6010.02 requires that each institution "devise a method to provide medical services 24 hours per day, seven days per week," but allows an institution to provide on-site medical care for only 16 hours per day where suitable arrangements are made with a local medical facility for coverage, an emergency transportation system is available, and CRP certified staff are in the institution during non-staffed hours.  This PS also requires institutions to "develop and follow a written plan to provide for 24 hour emergency medical, dental, and mental healthcare."  The PS advises that waiver to its provisions can be sought.  Apparently, Warden Reese had received a waiver from the requirement of providing 16-hours of on-site medical coverage, and on December 5, 2005, she submitted a request for a continuation of the exemption due to nursing shortages.  The waiver request was granted by defendant Holt on January 17, 2006, on the

and 6031.01.[34]  *See* First Amended Cplt. ¶¶ 65, 73.  Plaintiff has not established that these

Program Statements were violated.  However, even if defendants did violate these Program

Statements, such violations do not rise to the level of a constitutional violation.  *See Hernandez*

*v. Estelle*, 788 F.2d 1154, 1158 (5th Cir. 1986) (holding that the mere failure of a prison official

to follow the prison's own regulation or policy does not amount to a constitutional violation);

*McGowan v. Peel*, 2007 WL 710154, at * 1-2 (S.D. Miss. Mar. 6, 2007); *Bates v. Helman*, 1999

WL 160966, at * 3 (7th Cir. Mar. 16, 1999) (stating that the BOP's violation of a Program

Statement does not rise to the level of a constitutional violation); *Ortega v. Maynard*, 2006 WL

1877016, at * 2 (E.D. Ky. July 6, 2006) (stating that mere violation of a BOP Program Statement

or regulation does not implicate the constitution).  Accordingly, plaintiff's claims against

defendants for their alleged violations of these policies should be dismissed.

Qualified Immunity

Although the defendants have raised the defense of qualified immunity, "if it becomes

evident that the plaintiff has failed to state or otherwise to establish a claim, then the

defendant[s][are] entitled to dismissal on that basis."  *Wells v. Bonner*, 45 F.3d 90, 93 (5th Cir.

1993) (*citing Siegert v. Gilley*, 500 U.S. 226, 231-33 (1991)); *see also Sappington v. Bartee*, 195

F.3d 234, 236 (5th Cir. 1999).   Thus, because the court has found that plaintiff has failed to

---

grounds that all staff are trained in basic CPR and appropriate emergency procedures had been
developed and are followed when health care providers are not on-site.  The exemption was
effective until December 31, 2006.  Under the exemption, FCC Yazoo City was allowed to
operate with 12 hours of on-site medical coverage.  *See* MSJ Exhs. 20D, 21, 23, 24.

[33] PS 6013.11 establishes requirements for Quality Improvement Plans.  It does not
address what hours medical staff must be on-site at an institution.  *See* MSJ Exh. 25.  Plaintiff
does not specify how this PS was allegedly violated, nor is it clear to the court.

[34] PS 6031.01 provides, *inter alia*, that "[a]fter hour, weekend, and holiday coverage will
be provided by registered nurses and/or EMTs, where available, based on the institution's hours
of in-house health care staff coverage."  It also states that local procedures will be arranged for
provide for emergencies.  *See* MSJ Exh. 26.

establish constitutional claims, it need not reach the question whether the defendants are entitled to qualified immunity.  *Wells*, 45 F.3d at 93.

## RECOMMENDATION

For the reasons stated above, it is the recommendation of this court that plaintiff's Motion for Partial Summary Judgment [106] be denied, that defendants' Motion for Summary Judgment [93] be granted, that plaintiff's claims against defendant Holt be dismissed without prejudice for lack of jurisdiction, and that plaintiff's claims against the remaining defendants be dismissed with prejudice.

## NOTICE OF RIGHT TO OBJECT

In accordance with the rules and 28 U.S.C. § 636(b)(1), any party within ten days after being served a copy of this recommendation, may serve and file written objections to the recommendations, with a copy to the judge, the magistrate judge and the opposing party.  The District Judge at the time may accept, reject or modify in whole or part, the recommendations of the Magistrate Judge, or may receive further evidence or recommit the matter to this Court with instructions.  The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendations contained within this report and recommendation within ten days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions accepted by the district court to which the party has not objected.  *Douglass v. United Services Automobile Ass'n,* 79 F.3d 1415, 1428-29 (5th Cir. 1996).

THIS, the 13th day of August, 2008.

s/ Michael T. Parker
United States Magistrate Judge